278 F.2d 619
 Alfred M. SCHAFFER, Irving L. Young, James Alderman Evans,
Jr., and William Houston Evans, Executors of the
Estate of Charles R. Vose, Deceased,
v.
Ethel May Pressey BELOW, Also Known as Ethel May Bishop,
Individually and as Administratrix C.T.A. of the Estate of
Cornelius Comstock Below, Also Known as Cory Bishop,
Deceased, David Jenckes and Antilles Enterprises, Inc.
Ethel May BISHOP, Individually and as Administratrix C.T.A.
of the Estate of Cory Bishop, Deceased,
v.
Alfred M. SCHAFFER et al.; Executors of the Estate of C.R.
Vose, Alfred M. Schaffer, et al., Officers and Directors of
Antilles Enterprises, Inc., Antilles Enterprises, Inc., and
Ward And Virginia French.
Ethel May BISHOP, Individually and as Administratrix C.T.A.
of the Estate of Cory Bishop, Deceased, Appellant.
 No. 13050.
 United States Court of Appeals Third Circuit.
 Argued at Charlotte Amalie Jan. 27, 1960.
Decided April 29, 1960, Rehearing Denied June 8, 1960.
 
 W. H. Beckerleg, San Juan, Puerto Rico, for appellant.
 William W. Bailey, Charlotte Amalie, St. Thomas, Virgin Islands, for appellees.
 Before WOODBURY, FORMAN and ALDRICH, Circuit Judges.
 FORMAN, Circuit Judge.
 
 
 1
 The extensive factual background of this litigation is fully set out in the opinion of Circuit Judge Maris, who sat as the district court, and is found in Schaffer v. Below, D.C.V.I.1959, 174 F.Supp. 505, 508.[1]
 
 
 2
 Briefly stated, Charles Redfield Vose, Cory Bishop and David Jenckes entered into a joint venture on July 27, 1953, for the development of land on the island of St. John. Bishop and Jenckes, who were partners, contributed about 850 acres of land and Vose $50,000 in cash. Profits were to be divided on the basis of 30% To Vose and 35% Each to Bishop and Jenckes.
 
 
 3
 On September 2, 1953, they agreed to expand their venture by purchasing 635 acres of land in St. Thomas with money to be advanced by Vose, who was to be repaid by the joint venture.
 
 
 4
 On November 25, 1953, the three joint venturers formed a corporation, Antilles Enterprises, Inc., according to the laws of the Municipality of St. Thomas and St. John. Antilles was authorized to issue capital stock of $10,000 consisting of 100 shares, each having a par value of $100.[2] Vose subscribed for 30 shares, Bishop and Jenckes for 35 shares each.
 
 
 5
 On the same day they entered into a stockholders' agreement, which appears in full in the district court's opinion. In pertinent part it provided as follows:
 
 
 6
 "1.
 
 
 7
 'The consideration for the issuance of all shares shall be the transfer of all interests in Estates Rustenberg, Beverhoudtsberg, Guinea Gut and Sans Souci (St. John) to the Corporation and the transfer by Bishop to the Corporation of the $50,000 paid by Vose for his interest in the aforementioned estates. Bishop and Jenckes are immediately to endorse their certificates for their shares and deliver same to Vose to hold until Vose is repaid his advances, when the stock is to be redelivered to them. Meanwhile, they have the right to vote on stock, but all dividends, if any, are to be applied to reduction of debt due Vose. Any salaries to be paid shall be reasonable and approved by the parties hereto. Accountings shall be rendered to Vose of corporate activities and finances at least every three months.
 
 
 8
 "2. The stockholders agree that so long as they are alive, each shall not without consent of all otherwise encumber or dispose of the stock he now owns, or may hereafter acquire, except he may transfer all or part as gift to or for benefit of wife or other member of his direct family, who shall hold it subject to terms of this agreement. No stockholder may sell his stock until indebtedness to Vose has been paid off, except with his written consent, and all certificates of stock of the Corporation owned by stockholders shall be endorsed with following statement:
 
 
 9
 "'The shares of stock represented by this certificate are subject to the terms of an agreement between the stockholders and corporation dated November 25, 1953, a copy of which has been filed at the Office of the Corporation."'
 
 
 10
 "4. In the event of death of Vose, the survivors, together, or by the other, if one refuses, shall have the right to purchase from Vose Estate, his stock at a price which shall be the unpaid amount of moneys advanced by him, plus Vose' share of undistributed actually realized profits of Corporation up to the time of his death, to be calculated by book value on said date."
 
 
 11
 "In case of death of either Bishop or Jenckes, Vose and the other survivor, together, or the other if one refuses, shall have the right to purchase from decedent's estate, his stock at book value, but no allowance for good will, payments to be made one-quarter (1/4) on exercise of option to purchase and within six (6) months from qualification of deceased's representatives, and by three (3) notes for balance, one for each of three (3) successive years with interest, and with privilege of prepayment. While not in default, purchaser shall have voting and dividend rights, and on full payment, shall receive decedent's stock duly endorsed for transfer."
 
 
 12
 "6. All matters involving the major policies of the Corporation or the sale of the assets thereof, shall be determined upon by the unanimous consent of the stockholders of the Corporation." Schaffer v. Below, 174 F.Supp. 505, 509-510.
 
 
 13
 In accordance with their agreement the land in St. John and the $50,000 in cash contributed to the joint venture were made over to Antilles, the new corporation. The land had been purchased by Bishop for $24,000 subject to a mortgage of.$19,000. It was placed on the books of Antilles at a Valuation of $135,666.67 and the mortgage of.$19,000 was carried as a liability. Vose's cash contribution of $50,000 was so recorded. The sum of $10,000 was credited to capital stock in payment for the shares subscribed by Vose, Bishop and Jenckes respectively and the balance of $156,666.67 was carried as surplus.
 
 
 14
 On June 12, 1954, a second stockholders' agreement was executed by Vose, Bishop, Jenckes and Antilles. That agreement is identical with the first except that it reflects a transfer of 20 shares of stock from Jenckes to Vose who then held 50 shares compared to Bishop's 35 and Jenckes's 15.
 
 
 15
 On July 19, 1954, Bishop made an assignment to Lind Weber of ten of his shares subject to the stockholders' agreement of June 12, 1954. No certificate was issued to Weber at that time, but on December 24, 1955, one was issued to him by Vose who signed as Treasurer of Antilles.
 
 
 16
 On April 6, 1955, Bishop granted an option to purchase five of his remaining shares to Jenckes who assigned it to Vose, who exercised it in January 1956.
 
 
 17
 On April 16, 1955, Bishop assigned to George T. Kelly, III, Trustee for Ethel May Pressey Below (Bishop) ten of his shares of stock in Antilles, subject to the terms of the stockholders' agreement of June 12, 1954. The assignment was occasioned by the following circumstances: Bishop, whose true name was Cornelius Comstock Below, deserted his wife Ethel May Pressey Below in 1939. At the time of the joint venture he was living with a woman named Mildred T. Bishop who signed the conveyance of land as the wife of Cory Bishop, who had assumed her name. The appearance of the legal wife, Ethel May (who apparently adopted the name Bishop adopted by her husband), brought to light the defective conveyance by Mildred and Cory Bishop and made it necessary to obtain a waiver of dower from Ethel May to the property purportedly conveyed by Cory and Mildred Bishop as husband and wife. Ethel May Bishop signed a release of her dower on April 29, 1955. The assignment of the ten shares by Bishop to the trustee, Kelly, of this connection with the procurement was in connection with the procurement Kelly executed a declaration of trust declaring that he held the ten shares for Ethel May Bishop for her life with remainder to her daughter. In July Bishop, Ethel May, their daughter and her husband all joined in an instrument revoking and terminating the trust, declaring the entire title to the trust property in Ethel May Bishop absolutely and discharging the trustee. However, no certificate of stock in Antilles was ever issued to Ethel May Bishop or her trustee for the ten shares.
 
 
 18
 The relationship between Vose and Bishop suffered marked deterioration because of their conflicting views concerning policies to be pursued by the corporation. Bishop's activities in connection with its finances and the disclosure of his domestic difficulties caused the rift between them to widen.
 
 
 19
 On January 21, 1956, Vose concluded a purchase of Jenckes's remaining 15 shares. Vose's holdings now consisted of his original 30 shares, plus 20 shares previously transferred from Jenckes in June of 1954, plus this last purchase of 15 shares from Jenckes. He also exercised his option, obtained from Jenckes, to purchase five of Bishop's shares. In January of 1956, therefore, Vose had acquired a total of 70 shares as against 10 held by Lind Weber and 20 still in the name of Bishop, including the 10 shares assigned by him without certificate to Ethel May Bishop.
 
 
 20
 On January 23, 1956, a special meeting of the stockholders of Antilles was held. Jenckes's resignation as secretary and director, dated January 18, 1956, was offered and accepted. Vose presented charges and evidence against Bishop and Jenckes concerning their misconduct as directors and officers of the corporation. The charges were sustained and a new board of directors was elected replacing Bishop and Jenckes.
 
 
 21
 On May 5, 1956, as will be seen more fully later on, the capitalization of Antilles was increased to $100,000, consisting of 1,000 shares, each with a par value of $100.
 
 
 22
 On September 17, 1956, Bishop died domiciled in the Virgin Islands.
 
 
 23
 On January 31, 1957, Vose filed the following document in the district court together with a check for $1 and a consolidated balance sheet of Antilles as of September 30, 1956, prepared by Joseph Greenberg, C.P.A., showing an excess of liabilities over assets of $2,142.57:
 
 
 24
 'Estate of Cory Bishop, Deceased.
 
 
 25
 'To C.R. Vose, Debtor.
 
 
 26
 'Creditor hereby claims the right to purchase from decedent's estate at book value, all stock owned by decedent pursuant to a stockholders' agreement dated June 12, 1954, and hereby makes demand therefor and tenders herewith $1.00 for all of decedent's capital stock at their book value which is worthless.
 
 
 27
 By (signed) C. R. Vose.'
 
 
 28
 On July 10, 1957, Vose died, domiciled in the Virgin Islands.
 
 
 29
 Thereafter the two suits from which this appeal lies were instituted. The first, Civil Action No. 230-1957, was brought by Alfred M. Schaffer, et al., Executors of the Estate of Charles R. Vose against Ethel May Pressey Below (Ethel May Bishop), individually and as Administratrix, C.T.A. of the Estate of Cornelius Comstock Below, also known as Cory Bishop, et al. The second suit, Civil Action No. 138-1958, was brought by Ethel May Bishop, individually and as Administratrix C.T.A. of the Estate of Cory Bishop, deceased, against Alfred M. Schaffer, et al., Executors of the Estate of C. R. Vose, and other defendants. In each case counterclaims were filed.
 
 
 30
 The complaint and the counterclaim of the Executors of Vose sought judgment determining the Bishop's assignment of the 10 shares to the trustee for Ethel May Bishop was void, dtermining that Bishop owned 20 shares of the stock of Antilles at his death and ordering his administratrix to transfer these shares to the executors of Vose's estate pursuant to his exercise of the option to purchase them.
 
 
 31
 The complaint and counterclaim of Ethel May Bishop seek judgment interpreting the agreements among Bishop, Jenckes and Vose; declaring (1) that the ouster of Bishop on January 23, 1956, as director and President of Antilles and the subsequent increase in the capital stock of the corporation were illegal; (2) that Ethel May Bishop is the owner of 10 shares of the stock of the corporation and (3) that Vose's attempted exercise of the option to purchase Bishop's stock by the offer of $1 was a nullity; appointing a receiver for Antilles; enjoining the defendants from proceeding further with the sale of the assets of Antilles and awarding damages of $3,000,000 against Vose's estate.
 
 
 32
 The cases were consolidated for trial because they involved substantially the same issues.
 
 
 33
 The district court gave judgment directing, inter alia, that Vose's executors pay to Ethel May Bishop, administratrix C.T.A. of the estate of Cory Bishop, deceased, $448.33 and to Ethel May Bishop, individually, a like amount, both sums to run with interest from January 1, 1957, in full payment for 20 shares of stock in Antilles; that Ethel May Bishop as Administratrix C.T.A. upon the making of said payments transfer to the Vose estate, said 20 shares of stock held to have been 'registered in the name of Cory Bishop at the time of his death'; and adjudging that after the above payments of money and transfer of stock, all right, title and interest in the aforementioned 20 shares of Antilles stock shall vest in the Vose estate.
 
 
 34
 Ethel May Bishop has filed this appeal in which she contends that the district court erred in holding that Vose had an option, which he validly exercised, to purchase at book value the 10 shares of Antilles stock assigned to him by Bishop without certificate. Her argument that she was a stockholder in Antilles despite the fact that she did not hold a certificate for those 10 shares fails to take into account that she took them subject to the stockholders' agreement of June 12, 1954.
 
 
 35
 Paragraph 1 of that agreement requires Bishop and Jenckes to endorse their stock certificates and to deliver them to Vose until he, Vose, had been repaid his advances at which time the stock was to be redelivered to Bishop and Jenckes. Repayment had not occurred at the time of Bishop's death.
 
 
 36
 Paragraph 2 provided that no transfer of stock was to be made by either Vose, Bishop or Jenckes without the consent of the other two, except that any one of the three might transfer his stock in whole or part 'to or for the benefit of wife or other member of his direct family, who shall hold it subject to terms of this agreement.' Paragraph 2 also provided that:
 
 
 37
 "* * * No stockholder may sell his stock until indebtedness to Vose had been paid off, except with his written consent, and all certificates of stock of the Corporation owned by the stockholders shall be endorsed with the following statement:
 
 
 38
 "'The shares of stock represented by this certificate are subject to the terms of an agreement between the stockholders and corporation dated November 25, 1953, a copy of which has been filed at the Office of the Corporation."' 174 F.Supp. at page 509.
 
 
 39
 In addition, however, Paragraph 1 required Bishop and Jenckes to endorse and deliver their stock certificates to Vose until he, Vose, had been repaid his advances to the corporation. In view of these provisions it matters little whether the assignment to Ethel May Bishop was in the nature of a gift or sale since in either event Vose was entitled to retain Cory Bishop's endorsed stock certificates until his advances had been repaid.
 
 
 40
 It follows that her interest in those shares was only beneficial as the district court found, and that she has never had legal title thereto, such title having always remained in Bishop in whose name the shares were registered at the time of his death and who, by the provisions of Paragraphs 1 and 2 of the agreement was precluded from disposing thereof without the written approval of Vose.
 
 
 41
 Although it may be assumed that Vose knew of Ethel May Bishop's desire to obtain a certificate representing the 10 shares of stock assigned to her, it does not follow that he was obliged to accede thereto.
 
 
 42
 The district court correctly found that Ethel May Bishop held only equitable title in these 10 shares and that the legal title thereto remained in Bishop.
 
 
 43
 The appellant contends that Vose as director, president and majority stockholder of the corporation occupied a fiduciary relationship to her as a minority stockholder and as such was required to issue to her a certificate for the 10 shares, because the corporation had benefited by her release of dower rights. The immediate difficulty with this contention is that Ethel May Bishop had already released her dower rights and accepted the assignment without certificate of the 10 shares subject to the stockholders' agreement before she sought the issuance of the certificate. She may not now be heard to complain of the terms of the bargain.
 
 
 44
 Under Paragraph 4 of the stockholders' agreement of June 12, 1954, Vose had the right to purchase these 10 shares as well as the 10 shares concededly held by the Bishop estate. The district court held that as to all 20 shares Vose validly exercised his option to purchase by filing the document quoted above in the district court on January 31, 1957. We agree.
 
 
 45
 The appellant next contends that the district court erred in determining the book value of Antilles stock.
 
 
 46
 In this regard the district court correctly held:
 
 
 47
 '* * * The term 'book value' as applied to corporate stock, ordinarily means the net value, as shown on the corporate books of account of all the assets of the corporation after deducting all its liabilities. Lane v. Barnard, 1919, 185 App.Div. 754, 173 N.Y.S. 714; Fleming v. Fleming, 1930, 211 Iowa 1251, 230 N.W. 359, 369; Davis v. Coshnear, 1930, 129 Me. 334, 151 A. 725; Corbett v. McClintic-Marshall Corporation, 1930, 17 Del.Ch. 165, 151 A. 218; Mills v. Rich, 1930, 249 Mich. 489, 229 N.W. 462; In re Reben's Will, Sur., 1952, 115 N.Y.S.2d 228; 11 C.J.S. p. 521. See, also, annotations 33 A.L.R. 366 and 51 A.L.R.2d 606. In other words, it is measured by the net worth of the corporation as reflected on its books of account and does not reflect either the current market value of the stock or the current market value of the assets of the corporation unless those values are reflected on the books.' 174 F.Supp. at page 519.
 
 
 48
 Appellant's specific contention in this area is that approved accounting practice made it incumbent upon Antilles to appraise its land and to adjust the book value thereof to reflect any appreciation disclosed by the appraisal; and that the assets of Antilles as disclosed by the corporate books fail to reflect any such revaluation of, and appreciation in, the value of its land. Had this been done, she asserts, the value of the stock would have been increased because the market value of the property had appreciated greatly since its initial valuation.
 
 
 49
 Appellant relies on Aron v. Gillman, 1955, 309 N.Y. 157, 128 N.E.2d 284, 51 A.L.R.2d 598, to support her contention that the book value of Antilles should reflect the appreciated value of the land then held by the corporation. In Aron v. Gillman, the New York Court of Appeals held that where the value of inventory, susceptible of accurate calculation had concededly been incorrectly estimated and the erroneous calculation recorded on the corporate books, the correct figure would nevertheless be used in determining the corporation's book value. The distinction between that case and this is that here the appellant seeks a departure from recognized accounting procedure, i.e. the revaluation of the corporation's land and the application of any appreciation to the determination of book value. Aron v. Gillman, therefore, has no application here.
 
 
 50
 The district court considered the question of whether recognized accounting procedure precludes the reflection of appreciation in land values and properly concluded that it does.
 
 
 51
 It remained, therefore, for the district court to subtract the corporation's liabilities from its assets and to divide the difference by the number of shares of Antilles stock issued and outstanding on the date of Bishop's death, September 17, 1956.
 
 
 52
 Vose Exhibit 28 is the Antilles balance sheet as of that date. It shows assets of $1,636,646.21, and liabilities of $1,636,813.71. Included, however, in the liabilities under the heading 'Loans Payable-- C. R. Vose' was $45,000[3] of Vose's original capital contribution of $50,000, which the district court found to have been transferred improperly from paid-in surplus to indebtedness. As corrected the balance sheet shows liabilities of $1,591,813.71.
 
 
 53
 The resulting corporate book value of $44,832.50 reflected $90,000 added to the corporate assets by virtue of an increase in the capitalization of Antilles, authorized at the stockholders' annual meeting on May 5, 1956, from $10,000 consisting of 100 shares each with a par value of $100, to $100,000 consisting of 1,000 shares each with a par value of $100.[4]
 
 
 54
 Prior to this authorized increase the corporation's liabilities exceeded its assets, so that on May 5, 1956, its stock had no book value. The additional subscription of $90,000 resulted in assets exceeding the liabilities and restored the book solvency of Antilles.
 
 
 55
 It is noted that approval of the increase in capitalization was not given by the Virgin Island corporate authorities until after Bishop's death. The appellees have stated that this delay was occasioned by the challenged inclusion in the charter of amendments authorizing Antilles, a business corporation, to conduct insurance business, claimed to be ultra vires under the law of the Virgin Islands. Appellees further represent that a declaratory judgment action terminated in an affirmance of the amendments and that official approval was then forthcoming.
 
 
 56
 Apparently subscriptions to the stock in the sum of $90,000 were actually executed and entered in the corporate books as an asset before the charter amendments had been approved. Denial of official sanction of the charter amendments did not operate, in this case, to nullify the increase in capitalization in view of the fact that such approval was granted as a result of the declaratory judgment action.
 
 
 57
 Appellant argues, based on Paragraph 6 of the stockholders' agreement which requires the unanimous consent of all stockholders to a major policy change, that the increase in the capitalization of Antilles was illegal because Bishop did not consent thereto. The district court found that Bishop neither consented to nor protested the increase. It also found that he did not subscribe to any of the newly offered shares.
 
 
 58
 Since Bishop's stock was not prejudiced by that increase but indeed acquired book value where previously it had none, it would appear that whether Paragraph 6 of the stockholders' agreement has been technically violated need not be considered.
 
 
 59
 Even so, the appellant urges that the district court erred in dividing the corporation's book value by 1,000 and contends that 100 should have been used as the divisor. If that is so it follows that the $90,000 realized through the subscription to the additional shares would have to be subtracted from the assets because appellant may not have the benefit of the additional $90,000 without the concomitant 'burden' of the additional 900 shares. The district court found the assets to be $1,636,646.21, and the liabilities $1,591,813.71 as noted earlier. Subtracting $90,000 from $1,636,646.21 reduces the assets to $1,546,646.21. The corporation's book value then becomes a minus $45,167.50, and the shares themselves have no book value.
 
 
 60
 The district court was correct in including the increased capitalization of $90,000 in the computation of book value, in dividing the corporation's book value of $44,832.50 by 1,000, the number of shares issued and outstanding when Bishop died and in finding the book value per share to be $44.8325.
 
 
 61
 Appellant argued that certain alleged 'dificiencies' demonstrated that the books were not kept in conformity with standard accounting practices.
 
 
 62
 She first points to the erroneous entry of $45,000 as a loan by Vose to the corporation rather than as a contribution to capital to be carried in surplus. However, this error was corrected by the district court.
 
 
 63
 She next points out that the amounts brought forward on October 1, 1955 differ from the closing balance as of September 30, 1955 by about $11,000 and that there were discrepancies between items in balance sheets prepared by Price, Waterhouse & Company, auditors employed while Bishop was active in the corporation, and Greenberg, an accountant engaged by Vose. The balances of Price Waterhouse and Greenberg, the appellant contends, are at variance on some seven items.
 
 
 64
 Greenberg testified that as to these he found it necessary to make adjustments in the Price Waterhouse figures which adjustments increased the dificit by some $15,000. It is significant that the deficits found by Price Waterhouse at this time-- September 30, 1955-- was $222,743.31. Greenberg further testified that although these adjustments were turned over to the bookkeeper to enter as of the closing on September 30, 1955 and the opening period October 1, 1955, the entries were made only for October 1, 1955 and not for the closing period thus explaining the discrepancy between the two.
 
 
 65
 The appellant further refers to the fact that at the time Greenberg showed a deficit in net worth of $2,142.57 as of September 30, 1956 a report was made as of the same date signed by Polly Jo Evans and Vose as president and treasurer respectively of Antilles to the Secretary of the Virgin Islands showing the net worth of Antilles to be $250,000. There is a question as to whether this report was actually offered in evidence but under no circumstances does it affect the entries in the corporation books.
 
 
 66
 The district court found that with the exception of the $45,000 item, an innocent error, Greenberg's analysis was a correct portrayal of the financial affairs of the corporation. We are not persuaded otherwise.
 
 
 67
 Appellant also contends that the district court erred in finding that Vose had acquired 15 of Bishop's original shares. The district court made no such finding.
 
 
 68
 It is true, as noted earlier, that Bishop had assigned 10 shares without certificate of Lind Weber on July 19, 1954, and had granted an option to purchase five shares to Jenckes on April 6, 1955. Appellant points out that the option to Jenckes was made 'subject to the previous assignment of the stocks', and that thereafter Bishop assigned 10 shares without certificate to Ethel May Bishop's trustee on April 16, 1955.
 
 
 69
 Appellant relies on 13 V.I.C. 144 which reads:
 
 
 70
 'The title of a transferee of a certificate under a power of attorney or assignment not written upon the certificate, and the title of any person claiming under such transferee, shall cease and determine if, at any time prior to the surrender of the certificate to the corporation issuing it, another person, for value in good faith, and without notice of the prior transfer, shall purchase and obtain delivery of such certificate with the indorsement of the person appearing by the certificate to be the owner thereof, of shall purchase and obtain delivery of such certificate and the written assignment or power of attorney of such person, though contained in a separate document.'
 
 
 71
 Appellant misconceives the thrust of this statute. On its face it provides that the holder of a later acquired certificate has priority over a transferee without certificate where the certificate holder has given notice to the corporation before the transferee. This section has no application here.
 
 
 72
 The district court's finding of fact that Vose was not guilty of fraud finds ample support in the record. It is settled that this court will not overturn the district court's finding of fact unless clearly erroneous. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C. Such is not the case here and we therefore see no merit in this assignment of error.
 
 
 73
 Appellant attacks the ruling of the district court excluding a series of letters[5] between Vose and his attorneys on the ground that they were privileged communications under 5 V.I.C. 854.[6] Appellant's principal challenge rests on the charge of fraud by Vose as destroying the character of privilege. Fraud was not proved. Other contentions-- that the letters concerned legal rather than business matters and that their confidential nature suffered public disclosure because they had been filed in the records of Antilles from where they were produced by virtue of the appellant's subpoena duces tecum,-- do not effectively support the attack on the court's ruling to exclude them. Moreover, an inspection of the letters discloses them to be, if anything, corroborative of Vose's position and of no help to Ethel May Bishop.
 
 
 74
 Finally, the appellant urges that the district court erred in denying her motion for a continuance. A review of the record before us makes it clear that the district court's eventual denial of appellant's motion for a continuance was not an abuse of discretion. Indeed, the record shows that this case was adjourned from December 8, 1958, to December 12, 1958, and following the hearing of certain preliminary matters on that day, to December 16, 1958, and finally to February 9, 1959.
 
 
 75
 The judgment will be affirmed.
 
 
 
 [1]
 Other aspects of this litigation appear in the Matter of Estate of Vose, 3 Cir., 1960, 276 F.2d 424; Bishop's Estate v. Antilles Enterprises, 3 Cir., 1958, 252 F.2d 498; Bishop v. Vose's Estate, D.C.V.I.1958, 162 F.Supp. 92, affirmed 3 Cir., 1959, 264 F.2d 244 and In re Below's Estate, D.C.V.I.1958, 162 F.Supp. 88
 
 
 [2]
 After the incorporation the 635 acres previously referred to and other property in St. Thomas, were in fact acquired. For this purpose Vose put up $300,000. Eventually he had advanced to Antilles approximately $800,000
 
 
 [3]
 Accountant Greenberg testified to the effect that inasmuch as Bishop's and Jencke's contribution was land valued at $24,000 but mortgaged for.$19,000 he equalized their net $5,000 contribution in land value to Vose's contribution by crediting Vose with a loan of $45,000 of his $50,000 investment
 
 
 [4]
 Each stockholder of record on that date was given notice of his right to purchase nine new shares at $100 each for every old share then held. Any unsubscribed stock was to be offered to stockholders and officers who had already subscribed to their quota
 
 
 [5]
 Bishop's Exhibits C-6, 35, 36, 39, 41, 54, 71, 95, 185 and 186
 
 
 [6]
 '854. Lawyer-client privilege
 '(1) General Rule. Subject to section 865 of this title, and except as otherwise provided by paragraph 2 of this section communications found by the judge to have been between lawyer and his client in the course of that relationship and in professional confidence, are privileged, and a client has a privilege (a) if he is the witness to refuse to disclose any such communication, and (b) to prevent his lawyer from disclosing it, and (c) to prevent any other witness from disclosing such communication if it came to the knowledge of such witness (i) in the course of its transmittal between the client and the lawyer, or (ii) in a manner not reasonably to be anticipated by the client, or (iii) as a result of a breach of the lawyer-client relationship. The privilege may be claimed by the client in person or by his lawyer, or if incompetent, by his guardian, or if deceased, by his personal representative. The privilege available to a corporation or association terminates upon dissolution.
 '(2) Exceptions. Such privileges shall not extend (a) to a communication if the judge finds that sufficient evidence, aside from the communication, has been introduced to warrant a finding that the legal service was sought or obtained in order to enable or aid the client to commit or plan to commit a crime or tort, or (b) to a communication relevant to an issue between parties all of who claim through the client, regardless of whether the respective claims are by testate or intestate succession or by inter vivos transaction, or (c) to a communication relevant to an issue of breach of duty by the lawyer to his client, or by the client to his lawyer, or (d) to a communication relevant to an issue concerning an attested document of which the lawyer is an attesting witness, or (e) to a communication relevant to a matter of common interest between two or more clients if made by any of them to a lawyer whom they have retained in common when offered in an action between any of such clients.
 '* * * *'r i